IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST Jeremy C. SHEA, Attorney at Law.

Supreme Court

*No. 92–3063–D. Oral argument October 24, 1994.—Decided February 24, 1995.*

(Also reported in 527 N.W.2d 314.)

For the Board of Attorneys Professional Responsibility there were briefs by *Frank M. Tuerkheimer* and *LaFollette & Sinykin,* Madison and oral argument by *Frank M. Tuerkheimer.*

For Jeremy C. Shea there were briefs by *John S. Skilton, Michael G. Laskis* and *Foley & Lardner,* Madison and oral argument by *John S. Skilton.*

PER CURIAM.  *Attorney disciplinary proceeding; attorney's license suspended.*

This is an appeal and cross-appeal from the referee's report recommending that the license of Jeremy C. Shea to practice law in Wisconsin be suspended for three months as discipline for professional misconduct. The referee determined that Attorney Shea used for personal purposes a legal fee to which his law firm was entitled, misrepresented to his law partners that he had not sent a client an invoice for services and that he had not been paid pursuant to that invoice and, for purposes of his own financial gain, misrepresented to his law firm the quality of work performed by another member of that firm on the client's legal matter. The Board of Attorneys Professional Responsibility (Board) appealed from the recommendation for discipline, contending that Attorney Shea's professional misconduct warrants a two-year license suspension. Attorney Shea, while not objecting to the disciplinary recommendation, cross-appealed from the referee's determination that the money paid to him by the client was a legal fee and that his statements regarding the quality of the other firm member's legal work constituted a misrepresentation and from the referee's refusal to admit into evidence the results of Attorney Shea's polygraph test.

We determine that the professional misconduct established in this proceeding warrants the suspension of Attorney Shea's license to practice law in Wisconsin for six months. Although it is clear from the record that

there was no intent on Attorney Shea's part to steal these funds from his law firm, Attorney Shea's repeated denials to his partners that he had sent the client an invoice for $75,000 for consulting services in addition to the invoice he sent on behalf of the law firm, his failure to inform his law firm that he had received payment of the $75,000 invoice, and his misrepresentation of the quality of another attorney's work for financial gain constitute serious breaches of his fiduciary duty to his law firm and his duty of honesty to others in his professional dealings.

Attorney Shea was admitted to practice law in Wisconsin in 1961 and practices in Madison. He has not been the subject of a prior disciplinary proceeding. The referee is Attorney S. Michael Wilk, who was elected to the circuit court bench soon after filing his report in this proceeding. Based upon the testimony and evidence presented at a disciplinary hearing, the referee made the following findings of fact.

While employed at the law firm of Ross & Stevens, S.C., of which he was a shareholder, Attorney Shea was the lead attorney and billing partner in the formation and representation of Country Bank Shares Corporation (CBS), a bank holding company that, beginning in early 1988, sought to acquire four Wisconsin banks. Six million dollars of the approximately $16,000,000 acquisition price was to be secured through a private placement of CBS stock. Attorney Shea initially committed to purchase $200,000 of that stock and thereafter increased his commitment to $300,000. His investment was consistent with the law firm's unwritten policy permitting attorneys to invest in clients' businesses and receive investment income from them provided that the receipt of income did not violate the provision of Attorney Shea's employment contract with

the firm that "all fees, compensation, and other things of value received or realized as a result of the rendition of professional legal services by [him] in any capacity . . . shall belong to the [firm] whether paid directly to [him] or to the [firm]."

One of the objectives of Attorney Shea's legal representation of CBS was to assist its president, director and shareholder, Neal Brunner, in organizing an investor group. A couple who were friends and clients of Attorney Shea initially invested $500,000. When additional money for the acquisition was needed and at Attorney Shea's urging, they subsequently increased their investment to $750,000. When the acquisition neared closing in December, 1989, two other potential investors withdrew and it appeared the transaction might not be accomplished. Attorney Shea then increased his investment from $300,000 to $511,000, approximately one-half of his net worth, and obtained a bank loan for that additional investment, as he had for $200,000 of his earlier investment. The acquisition closed on January 2, 1990.

The banks to be acquired had agreed to share pre-closing earnings with CBS and CBS intended to use its portion, $438,336, to pay acquisition costs, fees and expenses, including legal fees. While there was no written retainer agreement between the law firm and CBS, as of December 15, 1989, the law firm's unbilled charges in the matter totaled approximately $50,000 but no fees had been billed to CBS for legal services. Mr. Brunner prepared a proposed CBS board resolution for its meeting of April 26, 1990 authorizing the payment of acquisition costs, fees and expenses in the amount of $438,336, including an item set forth as "Legal (J. Shea, Ross & Stevens, S.C.) $100,000" and the referee found that the board approved that resolu-

tion. We do not adopt the latter finding because it appears from the record that a similarly worded but different resolution referring to "legal fees and consulting fees" was adopted.

In early May, 1990, Attorney Shea undertook to prepare an invoice for legal services to be sent to CBS. When the firm's office manager told him that the time billed for work in progress through December, 1989 totaled $53,770, Attorney Shea instructed the manager to describe those services in full on the invoice but set forth $25,000 as the amount due rather than the total on the firm's ledger. He told the manager that the remaining unbilled charges of approximately $28,770 should remain on the firm's books. The computer-generated bill prepared by the manager set forth a total of $53,770.06 due as of the end of 1989 but, at Attorney Shea's direction, that total was covered up and $25,000 was typed over it. On the day the invoice was sent, the office manager informed the firm's managing partner, Paul Croake, of his conversation with Attorney Shea and the modification of the CBS bill.

When Attorney Shea sent the $25,000 invoice to Mr. Brunner on law firm letterhead on May 3, 1990, he also sent Mr. Brunner another invoice, headed "Jeremy C. Shea," followed by his law office address and the following:

> "For all consulting services rendered to Country Bank Shares Corporation from January 1, 1989 through April 1, 1990 in connection with negotiations and acquisition of stock in Country Bank Shares Corporation, structuring of Country Bank Shares Corporation in connection with formation of holding company, and all other matters related to the structure of Country Bank Shares Corporation ... $75,000."

CBS paid the law firm $25,000 on November 30, 1990 and on the same date made a separate $75,000 payment to Attorney Shea directly.

In December, 1990, the attorney who had assisted Attorney Shea in the CBS matter since mid-March, 1989, told the firm's managing partner that he had discovered Attorney Shea's $75,000 "consulting fee" invoice in the CBS file. Attorney Croake asked another partner, Thomas Zilavy, to talk to Attorney Shea about that invoice. Attorney Shea, having previously told the assisting attorney that he had not sent the invoice to the client, repeated to Attorney Zilavy that the $75,000 invoice had never been sent to CBS. Shortly thereafter, Attorney Shea went to Attorney Croake and told him of the invoice. He testified that he told Attorney Croake that he had prepared the invoice in response to a request from Mr. Brunner for a description of "consulting" services to provide a paper trail for claiming a tax deduction and intended to use it as a means to get the firm's fees paid. He said he told Attorney Croake that, because of some incorrect accounting advice, the plan would not work and the invoice was never sent and he never received payment of it. In fact, however, he had received a $75,000 check from Mr. Brunner less than two weeks prior to his conversation with Attorney Croake and used it to reduce the balance of one of the bank loans he had obtained to purchase CBS stock. Thereafter, in mid-January, 1991, Attorney Shea sent Mr. Brunner at his request a draft invoice setting forth a narrative of unbilled charges for post-closing legal services but he never sent Mr. Brunner or CBS an actual invoice for those charges.

On July 12, 1991, Attorney Shea announced his intention to leave Ross & Stevens and join another law firm. At that time, the outstanding balance of the firm's

work in the CBS matter exceeded $62,000. Of that amount, approximately $8,900 was attributed to the work of the attorney who had assisted Attorney Shea. In all, the assisting attorney had spent approximately 230 hours on the CBS matter and the referee found that work "of high quality and professional."

In connection with his pending departure from the law firm, Attorney Shea told several persons at the firm that Mr. Brunner might not pay the charges on the CBS account in full because of his unhappiness with the assisting attorney's work. On July 31, 1991, when he met with the managing partner to discuss the disposition of his various accounts with the firm, including the CBS matter, Attorney Shea proposed that substantially all of the remaining CBS unbilled charges be deducted from the deferred compensation to which he would be entitled upon leaving the firm. When Attorney Shea made that proposal, the firm believed that the $75,000 consulting fee invoice had never been sent or paid. At that meeting, Attorney Shea again spoke disparagingly of the assisting attorney's work and said he thought the attorney should be fired. He asked that the unbilled CBS charges he proposed as a reduction of his deferred compensation be discounted by an amount reflecting Mr. Brunner's alleged dissatisfaction with that attorney's work on certain of the CBS matters.

Soon after that meeting, the managing partner reviewed the CBS file materials and Attorney Shea's personal correspondence and discovered that Attorney Shea had billed CBS for $75,000 and collected that amount. When confronted with that information on August 7, 1991, together with the firm's demand for his immediate departure, Attorney Shea admitted that he had received the payment. Several days later, Mr.

Brunner sent the law firm a sworn affidavit stating, in part, that the $75,000 fee paid to Attorney Shea personally "was intended to be for other than strictly legal services, and CBS treated the fee as pay for other consulting services. This amount was in addition to the value of the legal services performed for CBS."

As Mr. Brunner's affidavit also stated that CBS intended to pay the firm for unbilled legal services, the law firm sent CBS an invoice on August 14, 1991 for the remaining unbilled charges. CBS made no payment but in November, 1991, Attorney Shea, who had left the law firm on August 7, 1991, took an assignment of that invoice in return for his personal cash payment of its full amount to the law firm. In June, 1993, the week before the scheduled hearing in this disciplinary proceeding, Mr. Brunner reimbursed Attorney Shea for that payment. Attorney Shea testified that he never asked Mr. Brunner for reimbursement until after the Board raised the matter in the course of his deposition during its investigation. Attorney Shea stated that Mr. Brunner agreed to pay him the $62,000 if it would assist Attorney Shea in the pending disciplinary proceeding.

On the basis of those facts, the referee concluded that Attorney Shea's use of the $75,000 he received from CBS constituted the personal use of a legal fee to which his law firm was entitled and was conduct involving dishonesty, in violation of SCR 20:8.4(c).[1] The referee also concluded that his lying to his partners about the $75,000 "consulting fee" invoice was

---

[1] SCR 20:8.4 provides:

It is professional misconduct for a lawyer to:

. . .

(c)   engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

deceptive and a misrepresentation and that his statement that the other attorney's work on the CBS matter was "sub-par" and his suggestion that the attorney be disciplined were misstatements of the quality of that attorney's work made for the purpose of Attorney Shea's economic advancement, all in violation of SCR 20:8.4(c).

In his cross-appeal, Attorney Shea first contended that the referee improperly concluded that the $75,000 payment he received from the client constituted a "legal fee." He asserted that the money could not constitute a legal fee as a matter of law absent a finding that he and his client intended it as a payment for legal services. Because the referee made no finding regarding that intent, Attorney Shea argued that the conclusion that he used a legal fee to which his firm was entitled was improper. In support of that position, Attorney Shea relied on the fact that he and Mr. Brunner testified that the $75,000 was paid to him in consideration of his having increased his own investment in the holding company and having persuaded two other investors to do likewise so that the proposed acquisition could be accomplished. He relied further on the fact that he never sought to write off his law firm's books any of his charges for the work done for the client.

Responding to that argument, the Board contended that whether the $75,000 constituted a legal fee was not a conclusion of law, as Attorney Shea asserted, but a finding of fact. As such, the Board argued, the referee's finding was not clearly erroneous and, consequently, is to be adopted on review. Even if deemed to be a conclusion of law, the Board further asserted, there is ample evidence in the record to support that conclusion.

The record in this case is extensive and, as the referee stated, the case is troublesome. Although the referee concluded that Attorney Shea's receipt of the $75,000 "constituted the personal use of a legal fee to which Ross & Stevens was entitled," that conclusion does not address Attorney Shea's state of mind at the time he took the money. The Board unsuccessfully argued that Attorney Shea "misappropriated" the money at the time he took it.

In support of its allegation of misappropriation, the Board pointed to the proposed resolution drafted by Mr. Brunner for the April 26, 1990 CBS board meeting. The proposed resolution authorized payment of acquisition costs, fees and expenses totaling $438,336, which included $100,000 for "Legal (J. Shea, Ross & Stevens, S.C.)." In its brief, the Board stated, "In short, the only source for Ross & Stevens to be paid was from the $100,000 allocated as legal fees by the resolution." The Board failed to note, however, that the proposed resolution was never adopted. Instead, the CBS board adopted a resolution referring to just what Attorney Shea claimed the payment was: "Jeremy C. Shea and Ross & Stevens, S.C.—Legal Fees and Consulting Fees $100,000." It is undisputed that Attorney Shea was entitled to retain for himself "consulting fees" separate and apart from "legal fees."

The burden of proof was on the Board to establish the alleged "misappropriation" and the Board failed to meet its burden with respect to that claim. There is no evidence in the record that at the time Attorney Shea took the $75,000, he intended to steal the funds from his law firm. Accordingly, we do not adopt the referee's conclusion that Attorney Shea's use of the $75,000 constituted the personal use of a legal fee to which his law firm was entitled.

However, the referee's findings of fact, conclusions of law and report, when read together, consider the misconduct in this case not as the isolated transaction of Attorney Shea's taking the $75,000 but as a series of misrepresentations and deceits for over a year. The referee found that: Attorney Shea concealed from the firm that he had personally received funds from a client while the firm was not being paid in full for legal fees; Attorney Shea lied to the firm about receiving the payment; Attorney Shea failed to send bills to the client for the unpaid balance of its legal fees.

It is undisputed that at the time of the $100,000 payment to Attorney Shea ($75,000) and the firm ($25,000), the firm had rendered legal services for which approximately $53,770 might have been billed. It is also uncontroverted that Attorney Shea changed the firm's bill from $53,770 to $25,000. Whether or not Attorney Shea believed he was entitled to the $75,000 as payment for his increased investment in the acquisition, at the time the client paid a total of $100,000 to Attorney Shea and his law firm from the funds specifically designated for payment of acquisition costs, fees and expenses, the law firm was entitled to receive payment in full of the unbilled charges for services rendered to the client.

As the referee and Attorney Shea's brief acknowledge, Attorney Shea tainted his receipt of the $75,000 by concealing and lying about the transaction and by depriving the law firm of any opportunity to assent to or to dispute his payment from the client. We understand the referee to have ultimately concluded that the entire pattern of Attorney Shea's conduct constituted a breach of his fiduciary duty to his law firm and his duty of honesty in his professional dealings with it. We agree.

Attorney Shea's second argument in his cross-appeal is that the referee improperly concluded that he had misstated the quality of his partner's work on the client's holding company and bank acquisition matter for his own financial gain. Attorney Shea asserted that his statements were not intended to criticize his partner's legal work in order to produce a financial benefit but were outbursts reflecting his anger at that attorney's having failed to keep him advised in an unrelated client's legal matter and his concern that, because of Mr. Brunner's dissatisfaction with a portion of the attorney's work, he might not be able to collect full payment of the receivable he offered to assume as a reduction of his deferred compensation.

We are unpersuaded by Attorney Shea's contention that, even if his criticism of his partner's work in the client's matter were unfair and unwarranted, they were not for that reason dishonest or deceitful and violative of the rules of professional conduct. The referee explicitly found that the partner's work on the holding company formation and bank acquisition was "of high quality and professional." Moreover the record discloses that the only dissatisfaction expressed by Mr. Brunner in respect to the 230 hours the partner worked in the matter was in respect to one item, a shareholder agreement for the holding company, and related not to the quality of the attorney's work but rather to the amount of time spent on it.

Attorney Shea's final argument is that the referee erred in refusing to admit into evidence the results of a polygraph test he took. Attorney Shea had offered those results as probative on the issues of his credibility in respect to the reason for which he was paid $75,000 by the client and his motivation in criticizing his partner's work in the client's matter. The referee

properly ruled the polygraph test results inadmissible. In doing so, the referee cited this court's holding in *State v. Dean,* 103 Wis. 2d 228, 307 N.W.2d 628 (1981), and expressly based his decision on the policy considerations set forth therein. There has been no showing that the referee erroneously exercised his discretion in making that ruling.

The seriousness of Attorney Shea's professional misconduct established in this proceeding warrants discipline greater than the three-month license suspension recommended by the referee but not as severe as the two-year license suspension for which the Board argued. His repeated misrepresentations to his law partners that he had not billed the client $75,000 for "consulting services," despite having been confronted with the invoice he had sent the client and for which he had been paid, and his misrepresentation to the law firm's managing partner of the quality of the work of another attorney in an attempt to reduce his own financial burden were dishonest. The appropriate measure of the gravity of those breaches of his fiduciary and professional duties, taking into consideration all of the circumstances in which they occurred, is the suspension of Attorney Shea's license to practice law for six months.

IT IS ORDERED that the license of Jeremy C. Shea to practice law in Wisconsin is suspended for a period of six months, commencing April 3, 1995.

IT IS FURTHER ORDERED that within 60 days of the date of this order Jeremy C. Shea pay to the Board of Attorneys Professional Responsibility the costs of this disciplinary proceeding, including the costs incurred by the Board in the appeal and cross-appeal, provided that if the costs are not paid within the time specified and absent a showing to this court of his inability to

pay the costs within that time, the license of Jeremy C. Shea to practice law in Wisconsin shall remain suspended until further order of the court.

IT IS FURTHER ORDERED that Jeremy C. Shea comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.