# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP85-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Daniel Parks, Attorney at Law: |
| | Office of Lawyer Regulation,  Complainant-Respondent, |
| | v. |
| | Daniel Parks,  Respondent-Appellant. |

DISCIPLINARY PROCEEDINGS AGAINST PARKS

| | |
|---|---|
| OPINION FILED: | December 13, 2018 |
| SUBMITTED ON BRIEFS: | September 26, 2018 |
| ORAL ARGUMENT: | |

| |
|---|
| SOURCE OF APPEAL: |
|   COURT: |
|   COUNTY: |
|   JUDGE: |

| |
|---|
| JUSTICES: |
|   CONCURRED: |
|   DISSENTED: |
|   NOT PARTICIPATING: |

ATTORNEYS:

For the respondent-appellant, there were briefs filed by *Peyton B. Engel* and *Hurley, Burish & Stanton S.C.*, Madison

For the complainant-respondent, there was a brief filed by *Brenda K. Sunby* and the *Office of Lawyer Regulation*, Wausau

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP85-D

STATE OF WISCONSIN       :       IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against Daniel Parks, Attorney at Law:**

**Office of Lawyer Regulation,**

        **Complainant-Respondent,**

   **v.**

**Daniel Parks,**

        **Respondent-Appellant.**

**FILED**

**DEC 13, 2018**

Sheila T. Reiff
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1 PER CURIAM. Attorney Daniel Parks has appealed a report filed by Referee William Eich concluding that Attorney Parks committed eight of 14 alleged counts of professional misconduct and recommending that Attorney Parks' license to practice law in Wisconsin be suspended for 14 months, rather than the two-year suspension sought by the Office of Lawyer Regulation (OLR). The referee considered Attorney Parks' objection to costs and recommends we impose the full costs of

this proceeding on Attorney Parks.  The OLR did not seek restitution and the referee did not recommend a restitution award.

¶2   In his appeal, Attorney Parks argues that the evidence was insufficient to support many of the referee's factual findings and all of the referee's conclusions determining misconduct.  Attorney Parks argues further that even if the referee's conclusions are upheld, the violations only support a license suspension of, at most, less than six months.[1]

¶3   Upon careful review of this matter, we uphold all of the referee's findings of fact and conclusions of law and conclude that a 14-month suspension of Attorney Parks' license to practice law is an appropriate sanction for his misconduct. We also deny Attorney Parks' objection to costs.  We see no reason to deviate from our usual custom, which is to require an attorney who has committed misconduct to pay the full costs of the proceeding, which are $42,226.26 as of July 6, 2018.  The OLR did not seek restitution and no restitution is ordered.

¶4   Attorney Parks was admitted to practice law in Wisconsin in 1991.  He has not previously been disciplined.

¶5   The allegations giving rise to this complaint stem from the time Attorney Parks was employed at the firm of Zacherl, O'Malley & Endejan (the firm), from 1995 until May

---

[1] A suspension of less than six months does not require the lawyer to undergo a formal reinstatement proceeding, which includes a character and fitness inquiry.  See SCR 22.28.

2013. He worked in the Ripon office. In April 2013, Attorney Parks announced he was leaving the firm. Following Attorney Parks' departure, the firm filed a grievance with the OLR, stating, among other things, that it had discovered that Attorney Parks had performed unauthorized legal work "on the side" ("non-firm work") while employed by the firm.

¶6 On January 12, 2016, the OLR filed a complaint against Attorney Parks. Initially, the OLR alleged 19 counts of misconduct. As the case proceeded, the OLR's complaint was twice amended, ultimately alleging 14 counts of misconduct. The first four counts involve allegations of unauthorized fee reductions and non-firm work. Counts five through 13 allege misconduct related to Attorney Parks' handling of several matters related to C.D. and her relatives. Count 14 alleged noncooperation with the OLR.

¶7 Attorney Parks filed an answer refuting most of the allegations. The parties engaged in extensive discovery. Prior to the evidentiary hearing, the parties filed stipulated facts. The referee conducted a three day evidentiary hearing in October 2017 at which some 18 witnesses testified. The referee issued a report on February 7, 2018, concluding that Attorney Parks committed eight of the 14 alleged counts of misconduct, that OLR had failed to prove six counts, and recommending a 14-month license suspension. Attorney Parks objected to costs. The referee issued a separate ruling, concluding that full costs were warranted. Attorney Parks appeals. The OLR did not cross-appeal.

¶8 On appeal, we consider whether the referee's findings are clearly erroneous. See In re Disciplinary Proceedings Against Carroll, 2001 WI 130, ¶29, 248 Wis. 2d 662, 636 N.W.2d 718. We independently review the referee's legal conclusions. Id.

¶9 At the onset we note that the partners at his former firm and C.D.'s relatives present a very different account of what transpired than Attorney Parks recounts. Attorney Parks characterizes the grievances against him as a "vindictive" collaboration between a partner at Attorney Parks' former law firm, Attorney Z., and Attorney Parks' former client, C.D.'s daughter, L.E. He contends that L.E. "is resentful over her own tumultuous relationship with her mother" and that Attorney Z. resents that Attorney Parks left the firm to start his own competing practice. This record is replete with accusations of lying; many of the issues turn on credibility assessments.

¶10 Credibility issues are left to the discretion of the trial court, or, in the case of a disciplinary proceeding, the referee. Gehr v. City of Sheboygan, 81 Wis. 2d 117, 122, 260 N.W.2d 30 (1977). In this matter, the referee's credibility determinations are intertwined with his findings of fact. See In re Disciplinary Proceedings Against Charlton, 174 Wis. 2d 844, 498 N.W.2d 380 (1993). Many of the referee's conclusions rest on implicit findings about the relative credibility of witnesses. When a court does not make an explicit finding, an implicit finding may suffice, but only if

4

the facts of record support it. <u>State v. Echols</u>, 175 Wis. 2d 653, 672, 499 N.W.2d 631 (1993).

**Non-firm work and fee reductions (Counts One-Four)**

¶11 The OLR alleged that that by engaging in self-dealing and misappropriating fees from the firm by performing and privately billing for non-firm legal work while employed by the firm, Attorney Parks violated SCR 20:8.4(c)[2] (Count One).

¶12 The referee concluded that the OLR established this allegation. Attorney Parks admits in the stipulated facts that he performed legal work for approximately 30 clients "on the side," collected at least $13,875 in fees, and deposited the fees into his personal account. Attorney Parks also admits he did not run conflicts of interest checks through the firm's client management software. The referee acknowledged but was clearly unpersuaded by Attorney Parks' assertion that one of the firm's partners gave him permission to handle some estate work "off the books." The referee noted that "files found on the firm's computer involved, among other things, small claims cases, contract and traffic cases, and custody disputes in addition to wills, that Parks handled and [Attorney Z.] denies giving any such permission."

¶13 Attorney Parks attacks several aspects of the referee's findings and his legal conclusion that Attorney Parks

---

[2] SCR 20:8.4(c) provides: "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

violated SCR 20:8.4(c). As he argued to the referee, Attorney Parks maintains that one of the firm's partners, Attorney Z., was well aware of Attorney Parks' non-firm work and, indeed, approved it. Attorney Parks claims this practice began in 2005, when one of Attorney Z's own clients could not pay a large legal bill so an arrangement was made whereby the client did remodeling work on Attorney Parks' home and Attorney Parks, in turn, paid the firm to reduce the client's outstanding legal balance. Attorney Parks claims this bartering plan went awry, and Attorney Parks took out a home equity loan to complete the project, which Attorney Z. co-signed.

¶14 Attorney Parks claims that over time, Attorney Z. regretted having co-signed the loan and that Attorney Z. encouraged Attorney Parks to conduct non-firm estate planning work so that Attorney Parks could earn extra money with which to accelerate his efforts to refinance the loan.

¶15 Attorney Z. flatly denied that he authorized Attorney Parks to engage in non-firm work. The firm's other partner, Attorney O., also denied authorizing any non-firm work.

¶16 Attorney Parks says that the referee's finding that files pertaining to outside work were found "on the firm's computer" is clearly erroneous. He maintains that all such files were kept on a computer belonging to Attorney Parks' acquaintance, C.D., so there would have been no such files on the firm's computer.

¶17 Post-briefing, the referee advised the court and the parties in writing that his reference to files on "the firm's

computer" was indeed a "minor factual error" and that the report should be amended to clarify that the documents in question were found on C.D.'s computer, not the firm's computer.

¶18 As corrected, the referee's finding of fact is not clearly erroneous.  Moreover, we are of the opinion that in making this finding, the referee was focused less on where files were found (although that is relevant to other allegations) and more on noting that even if Attorney Z. had authorized Attorney Parks to engage in some non-firm estate work, Attorney Parks clearly engaged in other non-firm work that exceeded the scope of any authorization.

¶19 Attorney Parks also complains that the referee made only an "implicit" credibility determination and says the facts of record do not support it.  He maintains that Attorney Z. is engaged in "serial dissembling" and points to evidence he believes supports this claim.

¶20 For example, Attorney Parks notes that Attorney Z. initially told the OLR that Attorney Parks made a deal with a client, M.W., to reduce M.W.'s legal fees in exchange for M.W. creating a legal website for Attorney Parks.  The OLR's first

complaint alleged misconduct related to this incident but dropped the charge when the complaint was amended.[3]

¶21 The referee noted that both partners denied giving Attorney Parks permission to engage in non-firm work. Although Attorney Parks argues that the referee failed to give adequate weight to his evidence, the referee clearly weighed the credibility of Attorney Parks' testimony and found it wanting. We will not reassess Attorney Parks' credibility. We conclude that the record supports the referee's findings and conclusion pertaining to count one and we accept them. See In re Disciplinary Proceedings Against Eisenberg, 2004 WI 14, ¶5, 269 Wis. 2d 43, 675 N.W.2d 747.

¶22 Turning to count two, the referee concluded, based primarily on Attorney Parks' own stipulated admission, that by earning fees from non-firm legal work, Attorney Parks violated a standard of conduct set forth in In re Disciplinary Proceedings

---

[3] The website came to the firm's attention when it tried to collect outstanding legal fees from M.W. M.W. indicated that he had created a website in an effort to offset his legal fees. The website prominently featured Attorney Parks, barely noted his affiliation with the firm, and implied Attorney Parks was offering financial consulting services at the firm's Ripon office. Although Attorney Parks disavowed any knowledge of the website, denied asking M.W. to create it, and took steps to remove it, this incident clearly sowed seeds of distrust between the partners and Attorney Parks.

Against Shea, 190 Wis. 2d 560, 527 N.W.2d 314 (1995), actionable via SCR 20:8.4(f).[4] (Count Two).

¶23 Attorney Parks disputes the referee's conclusion that he violated SCR 20:8.4(f) for the same reasons he disputes that he committed the misconduct alleged in count one; he maintains that Attorney Z. authorized him to perform non-firm work. Again, this turned on a credibility determination, albeit an implicit one, that we will not disturb. It is sufficiently supported by the record.

¶24 Counts three and four of the second amended complaint allege that Attorney Parks made unauthorized fee reductions, and/or accepted services that benefitted him personally in exchange for a reduction of legal fees, at the firm's expense. Specifically, the OLR alleged that: (1) in 2012, Attorney Parks reduced client M.W.'s legal fee by $3,122.70 without firm approval; (2) Attorney Parks agreed to reduce client R.C.'s

---

[4] SCR 20:8.4(f) provides: "It is professional misconduct to violate a statute, supreme court rule, supreme court order or supreme court decision regulating the conduct of lawyers."

In In re Disciplinary Proceedings Against Shea, 190 Wis. 2d 560, 527 N.W.2d 314 (1995), Attorney Shea sent a client for whom he had performed legal work two separate bills, one payable to the law firm, the other——for $75,000——payable directly to Attorney Shea. Both were paid. It appeared to the firm that an unbilled balance remained. Attorney Shea then represented to his firm that the (apparently) unbilled fees should be discounted, implying that the client was unhappy with an associate's performance. The court concluded that by concealing from the firm that he had personally received funds from a client while the firm was not being paid in full for legal fees, the lawyer violated SCR 20:8.4(c).

attorney fees in exchange for R.C. performing remodeling work on Attorney Parks' home; and (3) Attorney Parks agreed to credit legal fees owed by client H.W. in exchange for H.W. doing body work on Attorney Parks' car.[5]

¶25 The referee concluded, based specifically on the testimony of R.C. and H.W., that Attorney Parks engaged in self-dealing in violation of SCR 20:8.4(c) (Count Three) by collaborating with R.C. and H.W. for them to perform remodeling and auto work in exchange for a reduction of legal fees owed to the firm. The referee also concluded that Attorney Parks violated the standard of conduct set forth in In re Disciplinary Proceedings Against Shea, 190 Wis. 2d 560, actionable via SCR 20:8.4(f) (Count Four).

¶26 In alleging count four the OLR referenced three incidents: the write down of M.W.'s fee, exchanging fees for remodeling services with R.C., and exchanging fees for auto body work with H.W. In reaching his conclusion regarding count four, the referee focused only on the write down of M.W.'s fee. The referee acknowledged Attorney Parks' version of events but clearly found credible and relied on the testimony of both

---

[5] Attorney Parks notes that unlike Shea, he was not a partner, and he was not subject to an employment contract with the firm that provided that "all fees, compensation, and other things of value received or realized as a result of the rendition of professional legal services by [him] in any capacity . . . shall belong to the [firm] whether paid directly to [him] or to the [firm]."

Attorneys Z. and O., that Attorney Parks did not have authority to write down a substantial amount of legal fees, and concluded that Attorney Parks thus violated SCR 20:8.4(f).[6]

¶27 Attorney Parks refutes these conclusions and says the referee's implicit determination that these witnesses are credible is belied by other record evidence. Attorney Parks admits that he reduced M.W.'s fee, but maintains he was authorized to do so and was transparent about it. He says the fee reduction was recorded in the firm's billing system so there was no "concealment."

¶28 Attorney Parks contends that although he was not a partner, the firm was run——to quote Attorney Parks' former legal secretary——like "a group of solo practitioners all housed under the same roof." As such, he says that he had discretion over the cases he accepted and over fees, and that he had authority to authorize fee reductions. He says there was no firm policy prohibiting fee reductions. He cites corroborating testimony from other firm staff members who also reported reducing fees without permission.

¶29 Moreover, he says that, as a factual matter, he did not reduce R.C. or H.W.'s fees in exchange for services. He says R.C.'s affidavit is "preposterous" "incoherent and incredible" and that the record evidence, namely cancelled

---

[6] The referee did not make a specific finding or conclusion as to R.C. and H.W. on count four, but the findings he did make are sufficient to establish a violation of SCR 20:8.4(f).

checks and the testimony of his former wife, shows he paid R.C. for the work performed on his home. He alleges that both R.C. and H.W. lied in their affidavits, in exchange for fee reductions that were offered by the firm, not by him. Again, he says that his evidence is more credible than the opposition and that the referee improperly focused on whether he had permission to write down fees rather than the alleged misconduct, which turned on whether he traded fee discounts for personal work which, again, he asserts he did not.

¶30 The referee's findings implicitly accept, as credible, the testimony of Attorney Z. and Attorney O. and the testimony of the two clients, each of whom contradicted Attorney Parks' account of what transpired. The record evidence indicates that Attorney Parks was an associate, the firm paid the overhead, he was paid a percentage of his billings, and he needed approval to authorize a significant fee reduction. We accept the referee's findings and conclusions of law regarding counts three and four.

**Counts Five-13: Interactions with C.D. and her relatives**

¶31 The OLR alleged nine counts of misconduct relating to Attorney Parks' interactions with C.D. and her relatives. The referee concluded that Attorney Parks committed the misconduct alleged in four of the nine counts.

¶32 Attorney Parks and C.D. became acquainted in the early 1990s. Their lives were interconnected until her death in May 2013. Attorney Parks represented C.D. in a divorce in 1996 and in a personal injury claim in 2008. He reviewed documents

12

regarding a loan C.D. made to her daughter, and answered her legal questions on occasion.

¶33 Attorney Parks also occasionally used C.D.'s computer for his own work and, although he disputes it, there is record evidence that C.D. did some secretarial work for Attorney Parks.[7] Attorney Parks was a landlord and rented a home to C.D. beginning in 2008 until her death. In 2010, Attorney Parks and his then-wife borrowed $35,000 as an unsecured loan from C.D. Attorney Parks says that as C.D. became ill, he served as C.D.'s Power of Attorney, took her to medical appointments, and visited her at home and after she moved to a nursing home.

¶34 Attorney Parks was also close friends with C.D's daughter, L.E., and her husband, T.E. Attorney Parks represented T.E. in a personal injury case, wrote two wills for the couple, and was the best man at their wedding. Attorney Parks says that the relationship between mother (C.D.) and daughter (L.E.) was characterized by ongoing conflict and tension, in part because of a failed trucking business. Attorney Parks was also acquainted with C.D.'s sister, G.S., who is L.E.'s aunt. Attorney Parks represented G.S. in a divorce proceeding in 2011 and 2012.

**The $5,000 "Bonus" (Counts Five and Six)**

---

[7] C.D.'s medical records indicate that C.D. told three healthcare professionals that she did work for Attorney Parks until she entered a nursing home. C.D.'s sister, daughter, and son-in-law also testified that C.D. did legal work for Attorney Parks.

¶35 Attorney Parks represented T.E. in a personal injury case. The firm's standard contingency fee agreement provided that the firm would receive 33 percent of any recovery for attorney fees. The OLR alleged that at the time of settlement, without authorization from the firm, Attorney Parks unilaterally reduced the attorney fees from 33 percent to 25 percent, a $12,000 fee reduction.

¶36 T.E. and L.E. claim that thereafter, Attorney Parks mentioned, on some three occasions, that clients sometimes gave him a bonus. Then, during the meeting to obtain their settlement money, Attorney Parks asked about "his $5,000 bonus." There was testimony that the couple had little money at this time, but felt compelled to give him the requested bonus. L.E. said that she wrote a $5,000 check and handed it to Attorney Parks. He handed it back and asked that she write "gift" on the memo line, which she did. The fee reduction and "gift" meant the firm received $33,000 in legal fees instead of $45,000.

¶37 The referee concluded that Attorney Parks violated SCR 20:8.4(c) by unilaterally and without authorization reducing the firm's attorney fees, and by seeking and accepting an unauthorized $5,000 "gift" from L.E. and T.E. (Count Five). The referee concluded further that by engaging in self-dealing after seeking and accepting a "gift" from L.E. and T.E. in exchange for a reduction of legal fees owed to the firm, Attorney Parks violated a standard of conduct set forth in Shea, actionable via SCR 20:8.4(f) (Count Six).

14

¶38 Attorney Parks appeals these findings and conclusions. He reiterates that he had authority to unilaterally reduce legal fees especially where, as here, he thought it was necessary to facilitate the settlement.  He points to an anecdote from a legal assistant who once suggested to a partner that Attorney Parks should reduce a fee for another client and the partner said he would not "force the reduction of fees."  Attorney Parks says this confirms that he had fee setting authority.  He insists that the check was an unsolicited gift, as evidenced by his own testimony and that of his former wife, who thanked the couple.

¶39 With respect to count six, Attorney Parks suggests that unlike the lawyer in Shea, he was not a partner at the firm and there was no firm policy to violate, so his only duty to the firm was a duty of loyalty.  He says he did not violate that duty by making a reasonable judgment call to reduce a fee in order to facilitate a settlement that might otherwise have failed.  Attorney Parks maintains that there is no evidence that he arranged the gift in exchange or as a quid pro quo for the fee reduction.  So, Attorney Parks contends that the referee's conclusion, that he violated SCR 20:8.4(f), is wrong.

¶40 A review of the record demonstrates that in this instance, the referee clearly believed the testimony of L.E. and T.E., noting that they were in "dire financial straits" when they received their settlement and that both testified that the "gift" was not their idea, they did not offer it, and felt they needed to pay it to receive their settlement.  Both of the

15

firm's partners testified that the fee reduction was not authorized.

¶41 The referee also rejected Attorney Parks' suggestion that counts five and six are duplicative, explaining that count five addresses Attorney Parks' misconduct vis a vis his client, while count six pertains to his misconduct vis a vis his duty of loyalty to his firm.

¶42 We adopt the referee's findings of fact and conclusions of law with respect to these two counts. Although mindful of Attorney Parks' defense, we cannot conclude that the referee's findings, particularly since they rely heavily on the credibility of the witnesses, are clearly erroneous. The findings indicate that Attorney Parks unilaterally and without authority reduced the legal fees that would be paid to the firm then essentially recouped his own portion of that reduction by persuading the clients to pay him a bonus. The record is sufficient to support the referee's findings and conclusions on these counts and we accept them.

**Loan from C.D. (Count Seven)**

¶43 The referee concluded that the OLR failed to establish that Attorney Parks violated SCR 20:1.8(a) and (b)[8] when he

---

[8] SCR 20:1.8(a) provides:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(continued)

16

borrowed $35,000 from C.D. without proper disclosures.  Attorney Parks argued that C.D. was not his client when this transaction occurred.  The OLR did not demonstrate otherwise and has not appealed the referee's conclusion.  We therefore conclude that the referee's findings with respect to this count have not been shown to be clearly erroneous.  We accept the referee's findings and conclusion and dismiss count seven.

**Confidentiality (Count 8)**

¶44 After C.D.'s death, her daughter, L.E., obtained C.D.'s computer and discovered that it contained several client files and documents that she was able to access without a

---

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

(b) A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, excepted as permitted or required by these rules.

password.[9] L.E. gave the computer to the firm, which, in turn, notified the OLR.

¶45 The OLR alleged that, by working on client files on C.D.'s computer, Attorney Parks allowed C.D. access to client files at a time when C.D. was not working for the firm. The OLR further alleged that the clients did not give informed consent for non-employees to have access to their files, all in violation of SCR 20:1.6(a)[10] (Count Eight).

¶46 The referee concluded that the OLR established by clear and convincing evidence that Attorney Parks violated SCR 20:1.6(a). The referee rejected Attorney Parks' suggestion that the OLR had not shown that C.D. actually looked at the unprotected client files.

¶47 Attorney Parks appeals. He acknowledges that leaving client files without password protection on a non-firm employee's computer was not a proper practice to ensure client

---

[9] The complaint alleged that documents on C.D.'s computer included a Healthcare Power of Attorney document for a client we refer to as C.S., that included C.S.'s name, address, and the names of the client's designated health care agents. It also contained a beneficiary designation for a client we refer to as B.T., that included the full legal names and social security numbers of the client's six designated beneficiaries.

[10] SCR 20:1.6(a) provides: "A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in pars. (b) and (c)." Paragraphs (b) and (c) encompass necessary disclosures that are not implicated here.

confidentiality. However, he reiterates there is no evidence that C.D. actually looked at the documents and suggests that the fact that L.E. "found" them does not equate with his "revealing them." Therefore, he claims the record does not support the claim, as alleged. We are not persuaded and agree that the facts, as alleged and as found by the referee, are sufficient to establish that Attorney Parks violated SCR 20:1.6(a).

**Drafting C.D.'s will** **(Count Nine)**

¶48 The referee concluded that the OLR failed to prove that Attorney Parks violated SCR 20:1.7(a)(2)[11] by providing C.D.

---

[11] SCR 20:1.7(a)(2) provides:

(a) Except as provided in par. (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under par. (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(continued)

19

with assistance drafting her will when, knowing he was a beneficiary, there was a "significant risk that his representation was materially limited by his personal interests." The referee found that while Attorney Parks gave the firm's will template to C.D., there was no evidence Attorney Parks actually assisted C.D. in drafting her will. This finding has not been shown to be clearly erroneous and we accept the referee's conclusion. Count nine is dismissed.

### Purchasing C.D.'s car (Count Ten)

¶49 The referee concluded that the OLR failed to prove that Attorney Parks violated SCR 20:8.4(c) by using his power of attorney to effectuate the transfer of the title of C.D.'s vehicle to Attorney Parks, in contravention of the terms of her will, while C.D. was allegedly incompetent. The OLR focused on the statement of C.D.'s physician that "it is more likely than not that C.D. was not competent" when she signed the vehicle title. The referee, however, observed that this was not "clear and convincing" evidence which is needed to establish the alleged disciplinary violation. This finding has not been shown to be clearly erroneous. We accept the referee's conclusion and dismiss count ten.

### Rent payment (Count 11)

---

(4) each affected client gives informed consent, confirmed in a writing signed by the client.

There is no assertion that SCR 20:1.7(b) applies here.

20

¶50 The referee concluded that the OLR also failed to prove that Attorney Parks violated SCR 20:8.4(c) when, the day before C.D. died, Attorney Parks used his power of attorney to write himself a $1,500 check from C.D.'s account to pre-pay himself for upcoming June and July 2013 rental payments. Relying in part on the expert testimony of Attorney Mark Munson regarding the appropriate conduct of a power of attorney, the referee was persuaded that on this record, although the conduct was "questionable," there was no showing that Attorney Parks' action adversely affected anyone's interests. C.D.'s belongings remained in the rental property during June and July and T.E. and L.E. stayed in the property during that time. This finding has not been shown to be clearly erroneous and we accept the referee's conclusion; count 11 is dismissed.

**Release (Count 12)**

¶51 The OLR alleged and the referee agreed that Attorney Parks committed fraud, deceit or misrepresentation in violation of SCR 20:8.4(c) by the manner in which he obtained the signatures of L.E. and G.S. on a "release," and the terms of the release he drafted relating to C.D.'s will.

¶52 C.D. designated her sister, G.S., and Attorney Parks as the primary beneficiaries of her will. C.D.'s will provided that Attorney Parks was to receive 40 percent of her payable on death accounts and 40 percent forgiveness of the balance of the $35,000 loan from C.D. She also left Attorney Parks her "rifle, outdoor furniture, tools, air compressor, John Deere tractor, push mower, chain saw, and rototiller."

21

¶53 The will provided that G.S. was to receive 60 percent of C.D.'s payable on death accounts, C.D.'s vehicle, and what was left on Attorney Parks' loan (after the partial forgiveness) which was then about $21,351. The will forgave a loan to L.E. but otherwise excluded her daughter.

¶54 C.D. died in May 2013. A few weeks later, G.S. and L.E. met with Attorney Parks to discuss C.D.'s estate. Both G.S. and L.E. testified that they thought Attorney Parks represented them in connection with the estate. Attorney Parks testified that he told them both, verbally, that he was not acting as their attorney, but "regrettably I didn't send them a letter."

¶55 On May 24, 2013, the three met at a bank to finalize distribution of C.D.'s bank accounts. There, Attorney Parks asked them each to sign, and both G.S. and L.E. did sign, a document entitled "Full and Final Settlement & Release of All Claims." Both testified that they believed the document was necessary to close out the bank accounts. The "release" which was drafted by Attorney Parks provided that:

- G.S. and L.E. both released and discharged all claims and liabilities against Attorney Parks that may exist now or in the future regarding all sums that he (and his wife, etc.) may have owed to C.D. or her estate in any form known or unknown, including, but not limited to, contractual or due to his role as power of attorney for C.D.

- They agreed that no probate would be initiated by any of them.

22

- They agreed that they had divided the personal property and that they were satisfied with the division.

- G.S. would receive Attorney Parks' share of C.D.'s payable-on-death accounts.

- G.S. had to pay the funeral bill and any other of C.D.'s debts.

¶56 Essentially, this document released Attorney Parks from all liability, permitted him to keep whatever personal property he had received from C.D., and excused him from repaying the balance of his loan which was at least $21,351. In exchange, G.S. received all of the payable on death money, which was some $28,872.19.

¶57 The OLR alleged that as a result of this document, G.S. received $1,261.72 less than she was entitled to receive and she did not receive C.D.'s vehicle because that had been sold——by Attorney Parks to himself——shortly before C.D. died.[12]

¶58 The referee found that Attorney Parks failed to tell L.E. that he did not represent her or G.S., and failed to tell them that they should seek the advice of another attorney because he had an interest in the estate. The referee concluded that Attorney Parks' conduct pertaining to the release constituted misconduct that violated SCR 20:8.4(c).

---

[12] Attorney Parks states that he paid $15,000 for the vehicle and deposited those funds into C.D.'s accounts which, in turn, went to G.S.

23

¶59 Attorney Parks appeals. He maintains that the release reflected the three beneficiaries' agreement among themselves. He explained that G.S. wanted a car but did not want C.D.'s car so there was no conflict over his purchase of the vehicle. He adds that G.S. wanted a lump sum of cash, not years of modest monthly loan payments from Attorney Parks, hence the decision to forgive his loan but give G.S. all the payable on death accounts.

¶60 As evidence that G.S. and L.E. acceded to this agreement, Attorney Parks notes that L.E. brought a death certificate to the bank and that he wrote "per agreement" on a check he signed over to G.S. He says he did not threaten or force anyone and says that he did not tell L.E. she had to sign. He claims the fact he gave them copies of the release reflects his transparency. He claims that no one suffered any ill effect as a result of this document, but concedes that, because he was a beneficiary, it was a "poor decision." However, he says that there was no deceit, so there was no violation of SCR 20:8.4(c).

¶61 We are not persuaded. The referee clearly accepted the testimony of the two women that they neither fully understood what the "release" provided nor understood why they were signing it. Inducing G.S. and L.E., in the immediate aftermath of the death of their sister and mother, to sign a patently self-serving document designed to insulate himself from liability at the potential expense of G.S. was more than a "poor decision." We wholly agree with the referee's conclusion that

"Parks' conduct in this regard involved 'dishonesty, fraud, deceit or misrepresentation' within the meaning of the Rule."

### Conflict (Count 13)

¶62 The referee concluded that the OLR failed to prove that Attorney Parks violated SCR 20:1.7(a)(2) based on the theory that he was representing G.S. and L.E. in May 2013 when they were finalizing C.D.'s estate. While the two women may have thought Attorney Parks was representing their interests as related to C.D.'s estate, the referee found that there was no evidence that Attorney Parks was providing legal services to G.S. at that time, and L.E.'s own testimony indicated she did not consider him her lawyer at that time. These findings have not been shown to be clearly erroneous and we accept the referee's conclusion. Count 13 is dismissed.

### Non-cooperation (Count 14)

¶63 The referee also concluded that the OLR failed to prove that Attorney Parks violated SCR 22.03(2)[13] and

---

[13] SCR 22.03(2) provides:

Upon commencing an investigation, the director shall notify the respondent of the matter being investigated unless in the opinion of the director the investigation of the matter requires otherwise. The respondent shall fully and fairly disclose all facts and circumstances pertaining to the alleged misconduct within 20 days after being served by ordinary mail a request for a written response. The director may allow additional time to respond. Following receipt of the response, the director may conduct further investigation and may compel the respondent to answer questions, furnish documents, and present any information deemed relevant to the investigation.

25

SCR 22.03(6),[14] enforced via SCR 20:8.4(h)[15] by failing to cooperate with the OLR (Count 14). The OLR pointed to certain issues, such as Attorney Parks' failure to provide certain client names or a list of non-firm files on which he worked. The referee disagreed, finding that at most "Parks was guilty of some inconsistencies in his responses to the committee's inquiries . . .." This finding has not been shown to be clearly erroneous and we accept the referee's conclusion. Count 14 is dismissed.

¶64 We accept the referee's factual findings and conclusions of law and agree that Attorney Parks committed the professional misconduct alleged in counts one through six, eight, and 12 of the OLR's second amended complaint. We dismiss counts seven, nine, 10-11, and 13-14.

## Recommended Discipline

¶65 Attorney Parks contends that the recommended discipline——a 14-month license suspension——is excessive, even if the referee's conclusions relating to misconduct are upheld.

---

[14] SCR 22.03(6) provides: "In the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance."

[15] SCR 20:8.4(h) provides: "It is professional misconduct for a lawyer to fail to cooperate in the investigation of a grievance filed with the office of lawyer regulation as required by SCR 21.15(4), SCR 22.001(9)(b), SCR 22.03(2), SCR 22.03(6), or SCR 22.04(1)."

Attorney Parks argues that his misconduct is not so serious that he should be required to petition for reinstatement and prove his moral character and fitness to practice law. Attorney Parks argues that a license suspension of less than six months is sufficient. The OLR maintains that "Parks' pervasively dishonest conduct merits a lengthy suspension, whether that be the two-year suspension it had recommended, [or] the 14 month suspension recommended by the referee."

¶66 Ultimately, it is this court's responsibility to determine appropriate discipline. See In re Disciplinary Proceedings Against Reitz, 2005 WI 39, ¶74, 279 Wis. 2d 550, 694 N.W.2d 894. This court considers the seriousness, the effect on the legal system of repetition of misconduct, the need to impress upon the attorney the seriousness of the misconduct, and to deter other attorneys from engaging in similar misconduct. See In re Disciplinary Proceedings Against Arthur, 2005 WI 40, ¶78, 279 Wis. 2d 583, 694 N.W.2d 910.

¶67 Although no two disciplinary cases are exactly alike, cases in which lawyers collect fees from clients that they did not report to their firm, and multiple violations of SCR 20:8.4 (Misconduct) typically result in lengthy license suspensions.

¶68 Recently, we agreed that a one-year suspension was appropriate discipline for a lawyer, with no prior discipline, who committed two counts of misconduct in violation of SCR 20:8.4(c) and 20:8.4(f), for directly accepting compensation for consulting services, without notice to her firm. In re

27

Disciplinary Proceeding Against Trupke, 2018 WI 43, 381 Wis. 2d 136, 911 N.W.2d 361.

¶69 We also deem instructive In re Disciplinary Proceedings Against Brown, 2005 WI 49, 280 Wis. 2d 44, 695 N.W.2d 295. Attorney Brown was suspended 18 months for, inter alia, accepting fees from clients totaling some $16,000 while advising his firm that he was acting pro bono. See also In re Disciplinary Proceedings Against Koenig, 2015 WI 16, 361 Wis. 2d 16, 859 N.W.2d 105 (imposing two-year suspension for taking $39,920 in client fees that were owed to his firm); In re Disciplinary Proceedings Against Elverman, 2008 WI 28, 308 Wis. 2d 524, 746 N.W.2d 793 (imposing nine-month suspension on attorney for failing to report substantial co-trustee fees to his firm); In re Disciplinary Proceedings Against Schaller, 2006 WI 40, 290 Wis. 2d 65, 713 N.W.2d 105 (imposing two-year suspension for converting $4,290.85 from firm and failing to report income on tax returns). None of these cases resulted in discipline less than six months. There is more than sufficient support for the imposition of a 14-month license suspension here.

¶70 We are not persuaded by Attorney Parks' reference to In re Disciplinary Proceedings Against Curtis, 2018 WI 13, 379 Wis. 2d 521, 907 N.W.2d 91. In that case, the OLR initially alleged seven counts of misconduct. We concluded that the lawyer committed only four counts of misconduct involving trust account violations and tax evasion. Attorney Curtis was suspended for four months. The facts were quite different; it

28

is not a compelling example. There, in imposing discipline the court was mindful that Attorney Curtis had served prison time for tax evasion during which he was unable to practice law. Also, the court determined that the trust account violations were not intentional, did not involve misrepresentation or dishonesty, and he did not personally benefit from them. By contrast, here Attorney Parks was determined to have committed four separate counts of misconduct involving fraud, deceit or misrepresentation. We conclude that a 14-month license suspension is appropriate. No restitution will be ordered.

### Objection to Costs

¶71 Attorney Parks filed an objection to the OLR's pre-appellate statement of costs and also objected to the OLR's appellate costs. Attorney Parks reasons that he was exonerated on six of the 14 counts alleged against him and contends that the OLR "overcharged" the case. He asks the court to impose only 25 percent of the costs upon him. He argues that he should not have to "foot the bill" for the OLR's prosecution of conduct that didn't violate the supreme court rules. Attorney Parks points to In re Disciplinary Proceedings Against Arellano, 2013 WI 24, ¶52, 346 Wis. 2d 340, 827 N.W.2d 877, for the proposition that when the OLR drops charges prior to the evidentiary hearing, some reduction in costs is warranted.

¶72 It is true that Attorney Parks prevailed on six of the 14 counts alleged, but this court generally does not apportion costs based on the number of counts charged and/or proven. In re Disciplinary Proceedings Against Polich, 2005 WI 36, 279

29

Wis. 2d 266, 694 N.W.2d 367 (declining to reduce costs where the respondent prevailed on five of the seven counts brought against him).

¶73 While there are exceptions, such as Arellano, this is not one of them. Attorney Arellano was charged with 14 counts of misconduct and the OLR sought revocation of his law license. Before the hearing the OLR dismissed nine counts. Attorney Arellano was ultimately determined to have committed only two counts of misconduct and received a public reprimand. The OLR agreed that a cost reduction was appropriate in that case.

¶74 In exercising our discretion regarding the assessment of costs, we consider the submissions of the parties and the following factors: (a) the number of counts charged, contested, and proven; (b) the nature of the misconduct; (c) the level of discipline sought by the parties and recommended by the referee; (d) the respondent's cooperation with the disciplinary process; (e) prior discipline, if any; (f) other relevant circumstances. See SCR 22.24(1m).

¶75 Applying these factors, we are not persuaded that a reduction in fees is warranted here. We acknowledge that, after more than 25 years in practice, Attorney Parks has no prior discipline. We consider that the OLR alleged but failed to prove that Attorney Parks was uncooperative with the OLR.

¶76 The other factors do not weigh in support of a cost reduction. The OLR alleged 14 counts of misconduct. Attorney Parks contested them all. The referee ultimately concluded, and we agree, that Attorney Parks committed eight counts of

misconduct. The OLR sought a two-year suspension while Attorney Parks argued that a suspension of less than six months was appropriate. The referee recommended and we accept a 14-month license suspension.

¶77 In the Arellano case, we observed that the ultimate misconduct found and discipline imposed were not only much less than initially sought, but were also of a materially different nature. Here, although Attorney Parks was exonerated on a number of claims pertaining to his dealings with C.D., he was nonetheless deemed to have committed four separate violations of SCR 20:8.4(c), involving fraud, deceit or misrepresentation.

¶78 Attorney Parks litigated this case vigorously as is his right. That, more than any strategy on the part of the OLR, is the reason for the high costs. The referee concluded and we agree that Attorney Parks has not established that the amounts included for counsel and referee fees, reporting and transcript costs, copying, and medical records fees, were either "unreasonable," or "unnecessary."[16] We thus find no reason to

---

[16] Attorney Parks specifically objects to the $3,014 in expert witness fees paid to the OLR's witness, Attorney Mark Munson. He points out that while Attorney Munson testified as to eight counts of the original complaint, much of his testimony was that he had reached no relevant conclusions on the points at issue. Attorney Munson was not called to testify at the hearing. The OLR says that its retention of Attorney Munson, whether he served as a "testimonial expert" or a "consulting expert," was "part and parcel of OLR's overall litigation of this case." Supreme Court Rule 22.001(3) specifies that the costs of proceedings include "expert witness fees," and "compensation and reasonable expenses of experts." The OLR adds that it found Attorney Munson's opinions valuable.

depart from our general practice of imposing full costs on attorneys deemed to have committed misconduct. See SCR 22.24.

¶79 IT IS ORDERED that the license of Daniel Parks to practice law in Wisconsin is suspended for a period of 14 months, effective January 24, 2019.

¶80 IT IS FURTHER ORDERED that within 60 days of the date of this order, Daniel Parks shall pay to the Office of Lawyer Regulation the costs of this proceeding, which are $42,226.26, as of July 6, 2018.

¶81 IT IS FURTHER ORDERED that Daniel Parks shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.